[No. D009638. Fourth Dist., Div. One. Mar. 14, 1990.]

BLAINE MOGIL et al., Plaintiffs and Appellants, v.
CALIFORNIA PHYSICIANS CORPORATION et al., Defendants
and Respondents.

COUNSEL

Kussman & Whitehill and Michael H. Whitehill for Plaintiffs and Appellants.

Hassard, Bonnington, Rogers & Huber, Rick C. Zimmerman, Richard Johnston and Reggie Griner for Defendants and Respondents.

OPINION

**WORK, J.**—Blaine and Debbie Mogil appeal a summary judgment in their action against California Physicians' Insurance Corporation (CPIC) and Blue Shield of California seeking compensatory and punitive damages for breach of the covenant of good faith and fair dealing, breach of contract, violation of Insurance Code provisions, intentional and negligent infliction of emotional distress and civil conspiracy. They contend the defendants are not entitled to judgment as a matter of law because there are material triable issues of fact regarding whether the excision of the mole on Debbie's right shoulder constituted treatment for a preexisting condition excluded by the terms of the CPIC policy and whether the cancer treatment she received after the mole proved malignant was for an excluded preexisting condition. For the following reasons, we conclude Debbie's condition manifested itself to her and her husband with distinct symptoms before the effective date of the policy and, as a matter of law, was a preexisting condition expressly excluded from coverage. Accordingly, we affirm the judgment.

### FACTUAL AND PROCEDURAL BACKGROUND

When the Mogils sought medical insurance coverage, agent Daniel Bartel persuaded them to purchase a Blue Cross policy. Because that policy could

not provide immediate coverage, interim coverage was obtained from CPIC, a company essentially owned by Blue Shield. The 60-day interim policy provided immediate coverage to prevent a lapse in coverage pending approval of the Blue Cross application. The interim coverage was procured on October 9, 1985.

The application for the CPIC interim policy provided in pertinent part: "I also understand that no benefits are payable for injury sustained or sickness first manifested before the Effective Date. I agree that this application shall become a part of my policy." The policy generally excluded coverage for "[a]ny charges made in connection with a Pre-existing Condition," and defines "Pre-existing Condition" as "a Disability which existed prior to the effective date of the person's coverage under this policy." The policy continues: "A disability shall be considered to have been in existence prior to the effective date of coverage if, during that time, i. any professional advice or treatment of a Physician, or any medical supply (including but not limited to prescription drugs or medicines) was obtained for that Disability; or ii. the Disability was manifest to the Covered Person." The policy further defines "disability" as "a bodily injury, or an illness. . . ."

At the time the Mogils applied for medical insurance coverage, Debbie was pregnant, a condition both policies excluded. On October 28, 1985, during a routine prenatal examination, Dr. Edwards noticed a mole on her right shoulder and referred her to Dr. McCarthy, who removed it. A laboratory analysis revealed it was malignant melanoma and had spread. This finding resulted in further surgery. The objective evidence giving rise to the diagnosis were the growth and change in color of the mole, symptoms of which the Mogils were aware as early as April 1985 when they observed and discussed the growing mole and obtaining medical advice regarding the symptoms. Further, approximately three and one-half years earlier, Debbie went to a dermatologist, Dr. Chester Sidell, and had a mole at the same location on her shoulder and one on her back removed. She was aware both moles were sent out to the laboratory for analysis because of the possibility of malignancy. Fortunately, both earlier moles were benign.

The Mogils' Blue Cross insurance coverage became effective on November 1, 1985. Shortly after Blue Cross denied their claims, the Mogils submitted them to CPIC which denied them because the melanoma preexisted the effective date of the interim policy of October 9, 1985.

## THE PARTIES' CONTENTIONS AND STANDARD OF REVIEW

CPIC and Blue Shield contend the trial court properly ruled because the symptoms giving rise to the diagnosis of Debbie's melanoma existed and had come to her attention some six months before the effective date of the CPIC contract. Thus, treatment of the melanoma was for a properly excluded preexisting condition. Consequently, relying on *Bower* v. *Roy-Al Corp.* (1973) 33 Cal.App.3d 1027, 1041 [109 Cal.Rptr. 612], they argue Debbie's condition was clearly manifested to her because the general rule in construing such limiting language is to find "a sickness, illness or disease originates for purposes of such a limiting clause 'when it first becomes manifest or active or when there is a distinctive symptom or condition from which one learned in medicine can with reasonable accuracy diagnose the disease.' "

The Mogils contend that because CPIC acknowledges Debbie did not seek professional advice or treatment for the mole or cancer before the policy's inception, the preexisting condition exclusion only applies if it is determined her condition was "manifest" to her. Emphasizing the contract language should be construed according to its plain meaning and consistent with the parties' objective of providing indemnity for loss where the insurance relates (*Reserve Insurance Co.* v. *Pisciotta* (1982) 30 Cal.3d 800, 807-808 [180 Cal.Rptr. 628, 640 P.2d 764]), they correctly assert our resolution depends on the precise language of the policy and not the general rule defining preexisting conditions in insurance contracts, which failed to do so. Accordingly, not bound by common law construing preexisting condition absent a specific policy definition, our task is to interpret the policy phrase "the Disability was manifest to the Covered Person" consistent with the intent of the parties, their relative bargaining positions and the purpose of the insurance. Only upon doing so, will we be able to determine whether there is a triable issue of fact regarding whether Debbie's condition had manifested itself to her before the policy's effective date.

■ In determining whether the trial court properly granted the motion for summary judgment, we are mindful summary judgment may be granted only where no material triable issue of fact exists, as the moving parties' affidavits set forth facts entitling them to a judgment as a matter of law. (*Lipson* v. *Superior Court* (1982) 31 Cal.3d 362, 374 [182 Cal.Rptr. 629, 644 P.2d 822]; *Lopez* v. *McDonald's Corp.* (1987) 193 Cal.App.3d 495, 503 [238 Cal.Rptr. 436]; Code Civ. Proc., § 437c.) Designed to resolve litigation by avoiding needless trials (*Ferrell* v. *Southern Nevada Off-Road Enthusiasts, Ltd.* (1983) 147 Cal.App.3d 309, 313 [195 Cal.Rptr. 90]), the purpose for summary judgment "is to penetrate evasive language and adept pleading and to ascertain, by means of affidavits, the presence or absence of triable

issues of fact" (*Molko* v. *Holy Spirit Assn.* (1988) 46 Cal.3d 1092, 1107 [252 Cal.Rptr. 122, 762 P.2d 46]). "Accordingly, the function of the trial court in ruling on a motion for summary judgment is merely to determine whether such issues of fact exist, and not to decide the merits of the issues themselves." (*Ibid.*) Because of its drastic nature when granted of depriving the losing party of a trial on the merits, it should be used with caution so as not to become a substitute for trial determination of the facts and merits of a cause. (*Id.* at p. 1107; *Corwin* v. *Los Angeles Newspaper Service Bureau, Inc.* (1971) 4 Cal.3d 842, 852 [94 Cal.Rptr. 785, 484 P.2d 953].) ■ " 'In examining the sufficiency of affidavits filed in connection with the motion, the affidavits of the moving party are strictly construed and those of his opponent liberally construed, and doubts as to the propriety of granting the motion should be resolved in favor of the party opposing the motion.' " (*Corwin* v. *Los Angeles Newspaper Service Bureau, Inc., supra,* 4 Cal.3d at pp. 851-852, quoting *Stationers Corp.* v. *Dun & Bradstreet, Inc.* (1965) 62 Cal.2d 412, 417 [42 Cal.Rptr. 449, 398 P.2d 785]; *Twohig* v. *Briner* (1985) 168 Cal.App.3d 1102, 1105 [214 Cal.Rptr. 729].) To succeed here, CPIC and Blue Shield must conclusively establish as a matter of law Debbie's condition was preexisting within the context of the language of the contract requiring it be manifest to her and that under no hypotheses is there a material issue of fact requiring the process of trial regarding that issue. (See *Molko* v. *Holy Spirit Assn., supra,* 46 Cal.3d at p. 1107.)

### THE CPIC POLICY DEFINITION OF PREEXISTING CONDITION GOVERNS, APPLYING AN OBJECTIVE STANDARD OF MANIFESTATION TO THE INSURED

The Mogils contend by the express terms of the policy the disability must become manifest to the insured before the exclusion for a preexisting condition can be applied where the insured has obtained no professional advice or treatment by a physician for that disability. Moreover, they assert the policy expressly applies a subjective, rather than an objective, standard for determining whether the disability is manifest. In response to the general, common law rule defining a preexisting condition within the context of insurance policies which fail to do so, they contend that even if a doctor could diagnose a particular symptom or condition as being potential evidence of a disability, unless the insured was in fact told by a doctor or was otherwise independently aware of the disability, the disability would not be manifest to the covered person under the CPIC definition.

Relying on *Bower* v. *Roy-Al Corp., supra,* 33 Cal.App.3d at pages 1033, 1041, *Fohl* v. *Metropolitan Life Ins. Co.* (1942) 54 Cal.App.2d 368 [129 P.2d 24], *Cimino* v. *Reserve Life Ins. Co.* (1960) 181 Cal.App.2d Supp. 840 [5 Cal.Rptr. 850], and *Skroopka* v. *Royal Indem. Co.* (1955) 132 Cal.App.2d

Supp. 910 [283 P.2d 111], CPIC and Blue Shield contend a disability is "manifest" within the meaning of a preexisting condition exclusion when there exists distinctive symptoms sufficient to interfere with the insured's regular employment *or* from which a reasonably accurate diagnosis could be made by a physician. In other words, they rely on common law, derived from cases construing insurance policies failing to define preexisting condition, to argue an objective standard should be applied here. Because the CPIC policy expressly defines preexisting condition, this California precedent is significantly factually distinguishable and thus inapposite.[1] Consequently, we are not bound by the common law rule but required to construe the limiting language of the CPIC policy, the best evidence of the parties' intent. (*Blumberg* v. *Guarantee Ins. Co.* (1987) 192 Cal.App.3d 1286, 1292 [238 Cal.Rptr. 36].)

■ In deciding whether the phrase "the Disability was manifest to the Covered Person" implies a subjective, rather than an objective, standard, we are guided by established rules of construction, including: any ambiguity or uncertainty in the policy will be resolved against the insurer; if feasible, the policy will be construed so as to fairly achieve its manifest objective of securing indemnity to the insured for losses to which the insurance relates; reasonable doubt as to uncertain and ambiguous language will be resolved against the insurer; the policy will be given a layman's construction, rather than that of an attorney or insurance expert; any exclusionary language must be conspicuous, plain and clear; and finally an exclusion will be construed strictly against the insurer and liberally in favor of the insured. (*Crane* v. *State Farm Fire & Cas. Co.* (1971) 5 Cal.3d 112, 115-116 [95 Cal.Rptr. 513, 485 P.2d 1129, 48 A.L.R.3d 1089]; see also *Ponder* v. *Blue Cross of Southern California* (1983) 145 Cal.App.3d 709, 718-719, 723 [193

---

[1] The essence of these cases can be summarized as follows: *Fohl* follows the general barometer declaring an illness originates when it becomes manifest or acute rather than at the time of its medical cause or origin, additionally noting the plaintiff was not disabled from work until years after the policy became effective. (*Fohl* v. *Metropolitan Life Ins. Co., supra*, 54 Cal.App.2d at p. 379.) *Cimino* again cites the general rule a sickness should be deemed to have its inception at the time of first manifestation where it has become active, or when sufficient symptoms exist to permit a reasonably accurate diagnosis. (*Cimino* v. *Reserve Life Ins. Co., supra*, 181 Cal.App.2d Supp. at p. 842.) However, *Cimino* further refines the definition of manifestation as symptoms which affect or interfere with the person's normal activities. (*Id.* at p. 843.) *Skroopka* again echoes the general rule in a preventive breast surgery context to determine whether certain nodules or lumps were cancerous and malignant. (*Skroopka* v. *Royal Indem. Co., supra*, 132 Cal.App.2d Supp. at pp. 913-914.) Applying the objective standard, the court found no coverage because the symptoms giving rise to the exploratory surgery predated the effective date of the policy. (*Id.* at p. 914.) Finally, *Bower* simply echoes the holdings of the foregoing within the context of a disability policy, concluding the disability originated under the terms of the policy "when it manifested itself by distinctive symptoms sufficient to interfere with his regular employment or from which a reasonably accurate medical diagnosis could be made." (*Bower* v. *Roy-Al Corp., supra*, 33 Cal.App.3d at p. 1041.)

Cal.Rptr. 632]; *Franceschi* v. *American Motorists Ins. Co.* (9th Cir. 1988) 852 F.2d 1217, 1219-1220.)

In an effort to prevent fraud on insurers by concealment (*Mutual Hospital Insurance, Inc.* v. *Klapper* (1974) 262 Ind. 144 [312 N.E.2d 482, 484]), insurers formerly excluded coverage for sickness or illness originating or commencing before the effective date of the policy.[2] However, they failed to expressly define the term, preexisting condition. This resulted in judicial determinations throughout the United States that this terminology was ambiguous and strictly construing it against insurers by adopting the general rule a sickness or "illness is deemed to have its inception when it first becomes manifest or active or when there is a distinct symptom or condition from which one learned in medicine can with reasonable accuracy diagnose the illness." (Annot., Health Policy—Exclusion of Prior Illness (1979) 94 A.L.R.3d 990, 998; Meyer, Life and Health Insurance Law (1972) § 17:4, p. 551; see *Rozek* v. *American Family Mut. Ins. Co.* (Ind.Ct.App. 1987) 512 N.E.2d 232, 236; *American Family Ins. Group* v. *Blake* (Ind.Ct.App. 1982) 439 N.E.2d 1170, 1173-1174; *Mutual Hospital Insurance, Inc.* v. *Klapper* (1972) 153 Ind.App. 555 [288 N.E.2d 279, 281-282]; *Dirgo* v. *Associated Hospitals Service, Inc.* (Iowa 1973) 210 N.W.2d 647, 650 (emphasizing third alternative); *State (Comp. Health Plan)* v. *Carper* (Miss. 1989) 545 So.2d 1, 2-3; *Doe* v. *Northwestern Nat. Life Ins. Co.* (1987) 292 S.C. 241 [355 S.E.2d 867, 869].) It has been said this majority rule "serves the dual purpose of protecting insurers from fraudulent applicants seeking coverage for known diseases while protecting innocent premium-paying insureds from being deprived of benefits for pre-existing conditions of which they have no knowledge." (*Mutual Hospital Insurance, Inc.* v. *Klapper, supra,* 288 N.E.2d at p. 282.) However, it is in the disjunctive, setting forth at least three alternative standards for defining when a sickness exists, the latter two of which may not involve the insured's "subjective" awareness, to wit: when it is active or displays sufficient symptoms from which a physician could make an accurate diagnosis. (*American Family Ins. Group* v. *Blake, supra,* 439 N.E.2d at p. 1172; *Hannum* v. *General Life and Acc. Ins. Co.* (Tex.Ct.App. 1988) 745 S.W.2d 500, 501-502.) In any event, "[m]ost cases have adopted the majority rule apparently on the basis that while insurance

---

[2] Governed by the economics involved, an insurance policy normally covers only those losses caused while the policy is in force. In other words, health policies are usually designed to cover only losses due to sickness and illness contracted and commencing while the policy is in force. Consequently, health policies will employ various types of exclusions so as to avoid coverage for preexisting health conditions. For example, some policies have a waiting period or probationary period applicable to sickness so that losses due to sickness prior to the effective date of the policy are not covered. Others simply have an express exclusion for preexisting conditions. (Meyer, Life and Health Insurance Law (1972) § 17:1, p. 548; see also *Goshorn* v. *Hospital Care Corp.* (1989) 46 Ohio App. 47 [545 N.E.2d 930, 931].)

companies need protection from unscrupulous applicants who would fraudulently attempt to gain coverage for an illness of which they are already aware, such protection need not go so far as to consider a disease to exist at the time of its medical inception. Furthermore, to consider a disease to exist at a time when the victim is blissfully unaware of the medical 'seeds' visited upon his body, is to set a trap for the unwary purchaser of health insurance policies." (*Mutual Hospital Insurance, Inc.* v. *Klapper, supra*, 288 N.E.2d at p. 282.)

The adoption of this rule in many jurisdictions led insurers to employ the courts' language of "manifest." (*Cardamone* v. *Allstate Ins. Co.* (1977) 49 Ill.App.3d 47 [364 N.E.2d 460, 463.) For example, insurers started to use such language as any sickness "[c]ontracted and first *manifested*" (*Mayer* v. *Credit Life Insurance Company* (1972) 42 Mich.App. 648 [202 N.W.2d 521, 523], italics added); " 'Sickness as used in this policy means sickness which first *manifests* itself more than 15 days after the policy is in force. A sickness *manifests* itself if you receive medical treatment or consultation for it or have symptoms of it' " (*Hoffpauir* v. *Time Ins. Co.* (La.Ct.App. 1988) 536 So.2d 699, 701, italics added; *McCord* v. *Time Ins. Co.* (La.Ct.App. 1988) 521 So.2d 558, 559); " 'PRE-EXISTING CONDITIONS: Loss due to any condition that *manifested* itself prior to the effective date of coverage shall be payable after two years from the policy effective date' " (*American Sun Life Ins. Co.* v. *Remig* (Fla.Dist.Ct.App. 1985) 482 So.2d 435, 436, italics added; see also *Mutual Hospital Insurance, Inc.* v. *Klapper, supra*, 312 N.E.2d at p. 484); "covered sickness" is defined as " 'sickness first *manifested* while this policy is in force' " (*Preferred Risk Life Ins. Co.* v. *Sande* (Fla.Dist.Ct.App. 1982) 421 So.2d 566, 568, italics added); and simply a covered sickness must "first *manifest*" after the coverage has been in force 30 days (*Cardamone* v. *Allstate Ins. Co., supra*, 364 N.E.2d at p. 461, italics added).

██ Here, CPIC and Blue Shield have likewise borrowed from the common law general rule in crafting their limiting language as evidenced by their use of the term "manifest" in the clause in controversy as well as their alternative definition relating to the obtaining of any professional advice or treatment from a physician for the disability. Neither party offers us nor has our independent, computer-aided omniresearch found any judicial decision interpreting the precise phrase before us. Accordingly, we independently construe this provision with the aid of the cited rules of construction and the definitions of "manifest" employed by other jurisdictions.

"Manifest" has been defined within the context of symptomatology, as meaning " '[t]hat point in time when the sickness or disease becomes symptomatic and not necessarily when the exact nature of sickness or disease is diagnosed by a physician after extensive testing.' " (*Preferred Risk Life Ins. Co.* v. *Sande, supra*, 421 So.2d at p. 568, quoting an editor's headnote for

*McDaniel* v. *State Farm Mut. Ins. Co.* (1979) 3 Kan.App.2d 174 [591 P.2d 1094], where the court rejected an insured's argument a policy definition of sickness as any sickness or disease "first manifesting itself" while the policy is in force means before an illness manifests itself it must be clear to the policyholder, regardless of whether it is diagnosable by a physician.) A Florida intermediate appellate court later refined that definition where the condition had not yet been diagnosed by a physician as being " 'manifest when the insured knew or should have known of the existence of his illness because he was experiencing symptoms that would lead a reasonable person to seek a medical diagnosis.' " (*American Sun Life Ins. Co.* v. *Remig, supra,* 482 So.2d at p. 436.) Similarly, a Louisiana appellate court construed a provision " '[a] sickness manifests itself if you . . . *have symptoms of it*'" as meaning "an insured's symptoms must be such as would cause an ordinarily prudent person to seek medical diagnosis, care or treatment." (*McCord* v. *Time Ins. Co., supra,* 521 So.2d at pp. 559, 562.)[3]

Contrary to CPIC and Blue Shield's contention manifestation arises when the insured experiences distinct symptoms which would permit diagnosis by a medical expert, this precedent guides us to the conclusion a disability would be manifest to an insured when that insured has experienced abnormal symptoms which would place a reasonable person on notice he or she is suffering from an illness. This construction is consistent with not only the purpose of the exclusion of protecting insurers from fraudulent and unscrupulous applicants seeking coverage for known diseases, but also protects innocent premium-paying insureds from being deprived of benefits for unknown preexisting conditions. (See *Mutual Hospital Insurance, Inc.* v. *Klapper, supra,* 288 N.E.2d at p. 282, transfer denied by an evenly split Supreme Court in *Mutual Hospital Insurance, Inc.* v. *Klapper, supra,* 312 N.E.2d 482; *Rozek* v. *American Family Mut. Ins. Co., supra,* 512 N.E.2d at p. 236.)[4]

Relying on *Hovis* v. *Industrial Hospital Association* (1967) 71 Wn.2d 169 [426 P.2d 976, 977], the Mogils contend a subjective, rather than an

---

[3] In 1966, Virginia enacted a statute (ch. 184, § 38.1-361.1, substantially reenacted in 1986, ch. 562, § 38.2-3514) prohibiting the enforcement of an exclusion of preexisting illness if the applicant/insured did not know or might not reasonably have been expected to know about the condition. (*Sharp* v. *Richmond Life Insurance Company* (1971) 212 Va. 229 [183 S.E.2d 132, 134-135].)

[4] In fact, Arkansas Blue Cross and Blue Shield, Inc. has used the following limiting language in their policies: " 'A "condition or disease" which existed prior to the effective date of the subscriber's contract is one which caused symptoms or other manifestations prior to such effective date in such a manner as would cause an ordinarily prudent person to seek diagnosis, care or treatment.' " (*Arkansas Blue Cross & Blue Shield* v. *Fudge* (1984) 12 Ark.App. 11 [669 S.W.2d 914, 915].) Moreover, the model policy provision defining preexisting conditions in Hasnett & Lesnick, 2 The Law of Life and Health Insurance (1989) section 6.03[8], page 6-75, pertinently suggests in the disjunctive "[s]ymptoms existed that would cause an ordinarily prudent person to seek diagnosis, care or treatment. . . ."

objective, awareness standard construction should be given to the challenged phrase, thus providing a condition does not become manifest until it is *known* to the insured. We are unpersuaded.[5] ■ Preliminarily, contrary to the Mogils' position, a contract, even an adhesion contract, is not interpreted against the party causing the uncertainty unless established rules of interpretation are unsuccessful in removing the uncertainty. (1 Witkin, Summary of Cal. Law (9th ed. 1987) Contracts, § 698, pp. 631-632; Civ. Code, § 1654.) ■ Secondly, consistent with established procedure of applying an objective standard in interpreting contracts (see 1 Witkin, Summary of Cal. Law, *supra*, § 684, pp. 617-618), reason and common sense compel a conclusion an objective standard was intended by the parties. Not only does predictability mandate this conclusion, but so does the underlying purpose of the limiting language of preventing unscrupulous applicants from fraudulently obtaining coverage for known, undisclosed preexisting illnesses which would be essentially thwarted by placing the burden on the insurer of establishing precisely what an insured subjectively knew with regard to an illness. In other words, requiring the application of a subjective standard would unfairly place an additional burden on the insurer unnecessary to safeguarding the legitimate expectations of an insured while providing an opportunity for deceit to consume the valid underlying purpose of insulating the insurer from expenses arising from preexisting conditions.[6]

Moreover, we are unpersuaded by the Mogils' assertion disability is not manifest until the insured has suffered symptoms sufficient to interfere with his or her normal activities and employment. The Mogils draw this definition essentially from *Bower* v. *Roy-Al Corp., supra*, 33 Cal.App.3d at page 1041, and *Fohl* v. *Metropolitan Life Ins. Co., supra*, 54 Cal.App.2d at page 369, two *disability* insurance cases. The unreasonableness of using this standard within the context of health and hospital insurance is apparent, for often acute symptomatology will develop which will place a reasonable person on notice of the presence of a disease, but not interfere with normal vocational and avocational activities. This is such a case.

---

[5] This is not to say the insurer cannot expressly draft within a policy a subjective standard. For example, the policy in *Hulse* v. *Blue Cross/Blue Shield of Fla., Inc.* (Fla.Dist.Ct.App. 1983) 424 So.2d 191, 192, expressly provided: " 'A condition is pre-existing if it existed on or before the effective date of your coverage, *and you were aware of its symptoms,* even if the condition had not been specifically diagnosed.' "

[6] The Mogils' reliance on *Patel* v. *NN Investors Life Ins. Co., Inc.* (La.Ct.App. 1986) 498 So.2d 1162, is misplaced, because Mrs. Patel was asymptomatic before and during the exclusionary period. (*Id.* at p. 1163.) Moreover, the revelation of her Class III Pap Smear during this period constituted neither a "sickness" within the definition of the policy nor a definitive symptom putting her on notice she was suffering an illness. Rather, it simply required her to see a specialist for further examination and tests to determine whether she was suffering a specific disease.

Similarly, the Mogils' reliance on *Evans* v. *Investors Insurance Corporation* (1975) 272 Ore. 257 [536 P.2d 506], is misplaced.

## Debbie's Disability Was Manifest to Her Before the Effective Date of the CPIC Policy[7]

Guided by the foregoing, the trial court correctly concluded there is no material triable issue of fact regarding whether Debbie's cancerous mole constituted a preexisting condition. It is undisputed she had a prior history of dealing with suspect moles removed from her shoulder and back, biopsies performed and specimens sent to a laboratory for analysis. The fact those prior tests proved the moles to be benign is irrelevant. The fact they needed to be analyzed and why is revealing and controlling. Three and one-half years later, and six months before the effective date of the policy, the Mogils saw another mole had developed on Debbie's shoulder and watched as it grew and changed color. Because of these symptoms, Blaine encouraged Debbie to obtain medical advice. As a matter of law, Debbie's condition was preexisting in character, manifest to her and her husband because they knew or at minimum should have known in light of their prior experience, of the existence of her illness since the symptoms she was experiencing would lead a reasonable person to seek medical diagnosis many months before the effective date of the policy.

Finally, we emphasize it is the symptomatology which causes the sufferer or would cause a reasonable person to seek medical consultation, examination and treatment, that is determinative, not the ultimate result of the treatment disclosing the precise character of the condition. (See *Skroopka* v. *Royal Indem. Co., supra*, 132 Cal.App.2d Supp. at pp. 913-914; *Arkansas Blue Cross & Blue Shield* v. *Fudge, supra*, 669 S.W.2d at pp. 915-916; see also *Svenddal* v. *New England Life Ins. Co.* (Minn.Ct.App. 1986) 388 N.W.2d 787, 789.) We recognize the drastic character of summary judgment relief here, as exemplified by the many decisions finding summary judgment improper because of existing triable issues of material fact. (See, e.g., *American Family Ins. Group* v. *Blake, supra*, 439 N.E.2d at p. 1175; *Rozek* v. *American Family Mut. Ins. Co., supra*, 512 N.E.2d at p. 236; *Mutual Life Insurance Co. of New York* v. *Bohannon* (Tex.Civ.App. 1972) 488 S.W.2d 476, 478; see also *Republic Bankers Life Insurance Co.* v.

---

[7] The Mogils contend there exists a triable issue of fact whether a mole constitutes an illness or disability, claiming the cosmetic removal of a mole would in all probability not be covered by the CPIC policy. In fact, they assert there is no evidence the mole which was examined on October 28, 1985, was in the same condition before the inception of the policy persuading a doctor to counsel a patient to see a specialist to determine whether it should be removed. However, on this record, where it is undisputed the mole was growing in size and changing in color, such symptoms known to the Mogils six months before the effective date of the policy implied the presence of a disability or illness. Consequently, a material triable issue of fact does not exist regarding whether the removal of the mole and the sending of a specimen to the laboratory for analysis constitutes treatment of a preexisting disability under the policy.

*Hoffman* (Tex.Civ.App. 1972) 483 S.W.2d 268, 270.) However, this is not such a case.

### DISPOSITION

The judgment is affirmed.

Kremer, P. J., and Huffman, J., concurred.